Burton v. Espino, 24-12, 549 We've got Mr. Hart here for the appellant, Mr. Coates here for the appellee. Mr. Hart, whenever you're ready, no hurry. Yeah, and I just want to note for the record, in advance of your argument, that we know that you were court-appointed. Pro bono counsel, we certainly appreciate your service to your client and to the court. It's been a privilege. Thank you, Your Honors. May it please the court, the district court erred in granting summary judgment to the appellee. As this court's decision in Sears makes clear, the non-moving party's version of events in their verified complaint has to be accepted as true at summary judgment. Here? Is there a rule, this is out of the middle district of Florida, right? Yes. Is there a local rule, I'm asking, I don't know the answer to this, that requires a party to identify the evidence it is relying on for summary judgment? I know some districts have a rule which says, I'm attaching to my motion or to some statement of material facts all the evidence that I'm relying on. And the reason for those rules is so we don't have to do what we've articulated to courts before about being a pig looking for truffles in the woods. Because records are long sometimes and it's hard to ask a district court judge who's busy to be able to open every docket entry and to look at every line to see if this is verified or not. And so sometimes local rules have those rules which say, here are the five documents I'm relying on and here are the pages that are at and here's my statement of material facts and that's what I want to do. Some don't, some just have a rule which says, file your motion and everything is a fair game. Do you know what the state of the law is in the middle district? I'm unaware of a local rule requiring that, but I would just note that in his motion for summary judgment he does obviously bring up, or his response, the motion for summary judgment he brings up his second meta-complaint. Not the fact that it's verified, but he makes arguments along the lines that I'm making here. He refers to his claim slash 1983, which I think liberally construed could be his complaint, and he says our versions, you have to accept, look at the facts in the claim 1983, which I'm interpreting liberally as his second meta-complaint. The facts stated there have to be accepted as true. So he is kind of making this argument that whether or not he knows that his complaint is verified and it's given the same evidentiary weight as an affidavit, he's making this argument that it's summary judgment and what I'm putting forward. The only reason I ask the question I ask is because, let me just say, it's really hard to get around the verified complaint. So I'm with you on that and I'll talk about that with your opposing counsel. But it is odd the district court didn't mention it at all. And this is a very, very good and diligent district court judge. We actually have another order she wrote in a similar Eighth Amendment prisoner case that is very detailed and really good. It's just conspicuous that it's not mentioned. And part of it, I know that she inherited the case, and so I'm sure there's something to that. But I wonder if part of it is she just wasn't tipped off that this was actually evident in the summary judgment record. Sure. And I think that's totally fair. She obviously had it before. She describes it in detail in her order. But again, it's a pro se case. His second meta-complaint, his And it's very clearly verified. And so I don't know if it was just missed. Well, the oddity of the district court order to me, and you can tell me if you think I'm misreading it, is that she clearly takes his facts as alleged in the verified complaint when she's writing the factual piece of her opinion. But then when she shifts to analysis, it seems to me now she's relying really on the doctor's notes and not so much the verified complaint. So it seems odd to me to say that, like, she missed it. She got it for purposes of drafting the factual and procedural history, but then didn't use it, I guess. Sure. And I was being imprecise. What I mean, she obviously had it in front of her, like you're on her note. She has a separate section titled Plaintiff's Allegations. What I meant is she just missed the verification at the end. Because it is very clear at the end that he's verifying in a penalty of perjury. He signs it as true and correct, right? It's a sworn testimony in summary judgment. So let me ask you what I think is, for me, the hardest question. Because I agree with Judge Locke that the verified complaint, the allegations are, you know, pretty troubling. Here's the one remaining question I have, is that even if we accept all of the allegations in the verified complaint, do they give rise to a genuine issue of material fact vis-a-vis the doctor's treatment notes, right, of the February, what is it, or what's the April 23rd incident, right? Do they give rise to a genuine issue of material fact with respect to whether he subjectively knew of, you know, sort of a substantial risk of serious harm and then acted with criminal recklessness in ignoring it? Or was he just sort of like so dismissive and flippant, he never even got to a subjective knowledge that there was something serious going on here? Right, and I think, crediting Burton's account and what he says during the 90-second interaction, he is giving Dr. Espino, you know, he's telling him about, he has great head pain, right, he's complaining that, you know, he's still got visible head trauma and he just had two seizures and Dr. Espino is hearing this, he has this knowledge of this, and he knows because he's been monitoring Burton's seizure condition, he knows of the underlying seizure condition and that he's on anti-seizure medication. And yet Burton is in front of him telling him, I just got beat up. He actually says at page 14 of the complaint that he told Dr. Espino, quote, in pain, look at my head, I had two seizures and my fingers, to which hurt worse today. Right, and thank you. Is that right? That is correct, right. Is that enough, I guess, to then judge Newsom's question? Is that sufficient to put him on notice that there is an unglued gash on his head from being beaten two days earlier and that he had two seizures as a result of those beatings because of his epilepsy? Well, yes, Your Honor, because he's citing the notes, the evaluations on April 21st after the beating, so he knows he's got beatings, Burton still has the head trauma, but what I was more so, you know, going towards is Espino was involved in Burton's care up to that point, he knows he has the underlying seizure condition, he knows he's on anti-seizure medication, and here's Burton coming in after a beating saying, I just had two seizures, so Espino knew something was wrong at that point, or at least a reasonable jury could conclude that he knew something was wrong, and yet in the face of that substantial risk of serious harm, he does nothing, and in that way, in that respect, this is similar to this court's decision in Patel, where a trained medical responder, there's an inmate who's having heat strokes who's left in a van, trained medical responder finds him unconscious and simply does nothing, this court says it's not a case of, you know, inadequate aid, the reasonableness of which could be fairly disputed, he's confronted with a serious medical need and he did nothing, so from the facts known to Espino, even though it's a short interaction, he's got some background knowledge, he's signed some documents regarding the beating, he knows about Burton's underlying seizure condition history, and his treatment plan, and then Burton comes in and says, I'm in great pain, I just had two seizures, all that together, I think, a reasonable jury could conclude from that, that he knew that by failing to intervene there's a substantial risk of serious harm, that Burton's what appeared to be an unstable seizure condition would continue, unstable. What about the hand? I mean, we have some law, not necessarily all precedential, which seems to indicate that like, a broken finger or something is not objectively serious in the Eighth Amendment level, at least in the short term, here, as I understand it, there was a bending back of the finger, and that caused some harm, where do we, where does that fall in the sort of objectively serious part of the Wade test? So I think it is that he's, it's more than just he's got the finger, you know, bending back a little bit, he's got what appears to be, in the summer of 2020, finger deformities that are developing in severity, you know, it's Dr. Lawball saying that he's got a torn tendon, boutonniere deformity, and then the orthopedist, Dr. Ryan, saying that he's got a reduced range of motion, I mean, that, I think, is objectively serious in terms of it's being diagnosed as a condition, and then Dr. Ryan steps in and says, you know, he should have physical therapy to address. Is that sufficient, just simply being diagnosed, I mean, there's lots of conditions that people have of deformities that are just, they're just deformities, but they're not debilitating in any way, they don't interfere with life activities in any real way, they don't cause any significant pain in any real way, where does this fall on that, and what's our law with regard to that? Right, so he is still, like, he is still reporting finger pain throughout this, and he is, with the reduced range of motion, you know, it's conceivable that, you know, it could affect him long-term, especially if initially a spino looks at him, an x-ray comes back clean, and then come July, an x-ray's noting new deformities, and then three doctors, a nurse, Dr. Lawball, Dr. Ryan, are all noting deformities, like, you know, there's a transition here where it's progressively getting worse. But you don't deny, with respect to the finger, that the doctor was more attentive than you think he was with respect to the head, right? Well, absolutely. Ordered the x-rays, followed up, you know, there's not the same kind of indifference to use the lingo with respect to the finger as you think there is with respect to the head. Well, yes, and that's mostly as a result of, there's just nothing done as to his head on April 23rd. As I understand it, your claim, though, so your head claim is April 23rd, and your finger claim is November 3rd, right? Exactly. So, is that, I guess, my question related to what Judge Usom just asked is, is all that happens preceding it, all the treatments for the finger that he had received, relevant for the indifference prong by the time he gets to November 3rd, even taking, as a given, the allegations in the verified complaint that he told me to blow off because of my grievances? It's, yeah, it's certainly relevant, your honor. And even though he's getting, you know, he is getting examined, you know, by Dr. Lawbaugh, Dr. Ryan, by, I forget her name, a nurse in the July report, he is getting, you know, some diagnostic treatment there. But what that diagnostic treatment and those reports show is, you know, progressive worsening of his fingers, you know, to such an extent that finally an orthopedist steps in and says, I think he needs physical therapy to address this. So that's another distinction here, which is that I think your position is, is that we actually have, unlike other cases involving self-serving statements, we have objective evidence that is supportive of the self-serving statements, both as to the finger and the  You agree with that, right? Yes, your honor. Let me just push you then on the First Amendment claim. Light most favorable to your client, doesn't he still lose on the First Amendment claim because the grievances that were put forward, light most favorable to him, they all post-date April 23rd, 2020. It seems to me that the First Amendment claim is an easier call for us. Why is that not right? Well, your honor, first, it's not right because even though the grievances that he submitted, you're right, the first one is April 24th, so that's the day after. But his sworn testimony is that there were, you know, a reasonable inference from his version of events on April 23rd is that Espino was already mad at him for having filed the grievance. Yeah, but is there any evidence in the record that your client ever grieved his First Amendment retaliation claim? According to the light most favorable to his, he's gotta, he's gotta not just say he withheld treatment because he was indifferent. He has to verify and swear he withheld treatment because I complained and he knew that I was complaining about things that are protected speech and protected activity. I don't see that. Can you point me to it? And I'm sorry, I might be getting confused, your honor. Are you talking about his sworn testimony and his verified complaint or what he said in the grievance? Yeah, I'm really saying both and I wasn't, I wasn't precise enough. What I just want to know from you is, is that I still think that on medical indifference, you're in a much stronger position than on First Amendment retaliation because of the grievance time period problem and really, I'm going to call it causation for First Amendment retaliation problem. That's what I'd like your help on, light most favorable to your client. Sure. So light most favorable. Again, we have the burden sworn testimony regarding Espino's statements, which only makes sense. The only reasonable inference you can draw is that he had already filed a grievance against Espino. And then as to causation, this court doesn't need to look further than Espino's statements contained within Burton's verified complaint, which has to be accepted as true. I told you about writing those grievances on me, get out of my office. I got your grievances. Think about that the next time you write a grievance, which all accompanied, you know, these two critical medical interactions that he was having with Burton. May I ask one follow-up? And I've got one too. Yeah. Sorry. Go ahead. No, no, no. You, please. I just want to be clear, though. Even if that's right about the April 23rd, his claim on the First Amendment is still related to the November 3rd incident also, where he is also told, you cannot have the recommended treatment and I am not going to see you because I'm mad at you about the grievances, right? Right. It's both dates. And there we do have a record, a significant record. I think I count an attachment, I think it's B or C, like five or six grievances that are between the April incident and the November treatment, right? Right. Okay. All right. So one final one. Blocking and tackling. I assume you think the First Amendment claim could survive even if the Eighth Amendment claims fail? That's correct. There's some philosophical space between deliberate indifference and the sort of refusal that would deter a person of ordinary firmness. Is that the point? That's exactly right. Okay. That's helpful. Thank you. All right. Very well. You've got three minutes remaining. Thank you. Mr. Coates, let's hear from you.  Good morning, Your Honors. May it please the Court. Jacob Coates with Hillward Henderson, counsel for Dr. Espino. The district court's order granting summary judgment in Dr. Espino's favor was correct and should be affirmed. What do you think of the fact that she recites his facts in the factual and procedural ramp-up but then in the analysis section, so to speak, seems to ignore them entirely and pivots to the doctor's notes? Your Honor, as I read the district court's order, I believe that those allegations in the complaint were taken into account. They're cited. I think they can be squared with the medical records. I don't think that taking as true, for example, the allegations that Dr. Espino mentioned the grievances filed against him changed the outcome here. If we're talking, starting with the deliberate indifference claims, you know, I would first point out the substantial amount of medical care that the record reflects that Burton received. Let's take this out of the prison context. You're an epileptic and you go to your doctor two days after an incident where you were beaten on the head twice with an open gash and telling your doctor that you have had in the last two days two separate epileptic seizures. And your doctor sees you for 90 seconds and says, get out of here, I heard that you called the AMA and complained about me during those 90 seconds. Would that be, could you say that that is actual treatment in any way, form whatsoever? Well, for one, Your Honor, we know that Burton received immediate medical care. I don't believe this is disputed. And so there is no doubt, and this gets, I mean, this is maybe what we should be talking about, but it isn't, this, the claim isn't about what happened before or what happened afterwards. It may be true that he got medical care on the 21st and it may be true that he got medical care on the 27th. But the question is on the 23rd, when he went to see the doctor and the doctor told him, get out of here. Sure, Your Honor. You agree with me. Let's go through the elements because I just want to be clear. So as to the, you agree that it's objectively serious for someone who is epileptic to have an open gash on their head and to have had two seizures. That is an objectively serious medical condition, right? Yes, Your Honor, that's, that's a condition that we don't dispute would require a medical attention. Great. Second thing, was Dr., based on the light most favorable to the plaintiff here and taking the verified complaint as, as true as we must, was the doctor aware, A, that he was epileptic, B, that he had been hit on the head and had an open gash, and C, that he had had two seizures over the last two days? The record reflects that, that Dr. Espino was aware of the medical records from the initial treatment, right? So would be aware of the extent of the injuries. We know that Dr. Espino oversaw Burton's seizure treatment, which was an ongoing process. The answer is yes, that he knew that he was epileptic, yes, that he knew about the incident. And you agree that he knew that, that he had pain in his head, his head hurt, and that he had two epileptic seizures, right? And knew that the, that the seizure condition was being medicated and monitored and knew that in May of 2020, there would be another chronic illness assessment at which time his seizure condition would be assessed once more. Knew that Burton had ready access to pain medication if he were to visit the sick wing as he did, or? I just want to be clear, though. As to my question, you agree as to those three things, though. He did subjectively know those three things. I agree, Judge Locke, that he, that he knew. Knew he was epileptic. He knew about the head injury from what happened, knew about the incident, and he knew that on that day, he, that, that the plaintiff came in complaining of head injuries, complaining of two seizures, and needing medical care. Correct, Your Honor. So I think, I think the question becomes under, underweighed, was Dr. Espino subjectively reckless? Well, I, I, but if he subjectively, if he knew that part, then the next question is, is telling him, pound sand, you complained against me, you get nothing today. Is that criminally reckless? In other words, he was subjectively aware of something and created a serious risk to, to the plaintiff of what he had an objectively serious medical condition for. Well, I think, I think the question is, is, was Dr. Espino, did he have the knowledge that his actions, so here, his actions. Created a serious risk of harm. Correct, Your Honor. And, and so here, the question to my mind is, what was Dr. Espino supposed to do further? And if, if the, if the answer is, order a brain scan, I think we're talking about a  Well, is the answer something, do you agree with me the answer is something? Whatever it is. I think under these circumstances where Burton presents with a small head laceration and a seizure condition which is already being monitored and medicated and was scheduled to be. And for which he had two seizures, for which he had two seizures over the last two days. The record reflects that he had two seizures immediately following the altercations on April 21st. So he received medical attention after that. The record reflects that he was alert oriented. That's what medical staff reports from the initial treatment. So I just want to be clear. Doing nothing doesn't create a serious risk of, of anything to the plaintiff. Under the facts here, the undisputed facts? No, Your Honor. Not, not at that time. At that moment in time. So not seeing any medical care. I just want to be clear. Not any medical care based on those facts for four more days. Even if he knew. I don't know that there is evidence he knew that there was an appointment four days later, but let's assume that he did know that. Telling him, pound sand, four days later someone's going to be taking care of you and you'll receive nothing over four days. That is, doesn't create a serious risk of further harm from his epilepsy? I think part of Dr. Espino's job or any medical provider's job is to exercise their judgment as to what treatment is necessary. The deliberate indifference standard, it's clear that, you know. When we think of our case law though, which seems to suggest your, your, your opposing counsel sort of referenced it, but we've said in McElligot, for example, that a delay of even a few hours in treating an inmate, that a prison official may violate the Eighth Amendment under those conditions. We also said in Ancada that if necessary medical care has been delayed for non-medical reasons, a case of deliberate indifference has been made out. Your Honor, when we look at those cases, if we look at McElligot, cases like the Melton case, these are situations where there's an immediate and obvious risk of, of serious harm and, and there's evidence to show that the provider there knew of the, of the risk. McElligot, you know, this is an inmate who's... But here he knew of the epilepsy and he knew he had seizures and he knew of the head injury. Right, but in those cases, the, the injury, the severe injury is right in front of the provider. There's, there's no question of, well, you know, can we continue to monitor... So only if he was seizing in front of the doctor and the doctor did nothing, that's the only condition that would, that would, that were these, those cases would be triggered? No, I mean, I think, I don't think that the, that the facts here, the undisputed facts, I don't think that they establish that there was the sort of obvious need for additional medical care. And again, what, I don't know what that... Obvious need happens for lay people. We use that standard for like prison guards who aren't doctors, but lo and behold, we happen to have a doctor here and we have a doctor who specializes in this very thing and who happened to be treating this particular, uh, uh, this particular plaintiff. So he knew his medical condition. It's not a matter of obvious. He doesn't need like the bone to be coming out of the skin or like blood to be coming out of one's ears. Sure. The doctor understood that if you are epileptic, even when treated and taking your medication and you're beaten on the head and seized twice, does that not create a serious risk that someone, you might need something, maybe even like look in your ear with the little camera thing? Well, I think here, your honor, uh, there needs to be a showing that Dr. Espino knew of specific actions that here, I think it would be specific treatment that he needed to provide. What we will avoid... My question is simply, do you agree that it was reckless, criminally reckless not to do anything? Like, I agree if it was an x-ray between a scan, between like a Tylenol, we can all sort of debate that. But to do nothing and to say, get out of here because I am mad at you and you don't get medical treatment for four days. That's what happened here in the light most favorable to the plaintiff. Is that not creating a substantial risk to the plaintiff under those circumstances? I don't believe so, your honor. What's your best case for that statement? I think, I think our best case is, is that, um, Burton received, uh, immediate... Best decision. What is the most, a precedential decision on point for what you've just stated? I would simply rely on the, on the standard in Wade, your honor. I don't believe that there's, uh, that there's a showing here that Dr. Espino knew that his conduct at that time would cause... In Wade, and at least two people on this panel are very familiar with it, having heard it like three times, um, but in Wade, uh, there, each actor, although not at their best, all did something. Every one of them, under similar circumstances, by the way, did something. Sure, and I, and I think Dr. Espino did something here by observing, um, Burton, by, by filling out a detailed... But if we take the verified complaint and the allegations therein in the light most favorable to your adversary, he was only in there for 90 seconds. What could he possibly have done? Observe the status of Burton's head injury, observe that he's not, um, in a state of a neurological distress of any kind, um, observe... Observe... While barking at him to get out of here, you're, you know, sort of, as, as Judge Lux says, pound sand because I'm mad at you. Sure, uh, your honor. I, I think, um, part of the medical, uh, judgments that Dr. Espino's making, I think simply seeing Burton at, in examining his medical records, which, um, the, the records shows that Dr. Espino did look at the report from the April 21 examination. I think we're examining those records, seeing, uh, Burton going on to, uh, fill out a detailed evaluation report, which notes that the injuries to be minor, um, and that the head, the head wound had been treated, um, and I think under, under those circumstances, I think simply saying that Dr. Espino did nothing at all is not fair because the, the flip side of that is what was Dr. Espino supposed to do if the, if the question is was he... The question is, do you, the only question to you is, do you think he had to do something? Even just look, because in the allegations in the light most favorable of the plaintiff, he did, didn't even do a, a minimal examination. He just said leave. I don't know, your honor, how that can be squared with the, with the evaluation. That's what we have, that's why we have, uh, juries to square those things, but... Okay, so Burton taking it as true, Burton's allegations, I don't think that they're inconsistent with Dr. Espino's evaluation report. Burton's in there for 90 seconds, and Dr. Espino gets the opportunity to, uh, to see his injuries, um, and then we... I want to talk about the hand injury. I'd like to go through the same analysis we did, um, because I think that'll be helpful. So, first of all, as I understand it, by November 3rd, which is really the relevant date here, you had, uh, the injury to the hand from, uh, April 21st, uh, you had, uh, continual appointments treating that pain, you had an expert reference, an expert indicating a deformity in the finger, and then recommending, uh, treatment for that deformity. And then, despite that, continue, uh, uh, statements of pain. And then we get to November 3rd. Is that not an objectively serious, uh, medical issue at that point? Well, we know that, uh, Burton did receive, in fact, medical attention, uh, at all those times. Um, I think that the district court's decision to, um, to focus on the deliberate indifference in the causation... Do you agree it's an objectively serious medical, uh, need at that point? Well, I, I think it's important to isolate, um, the issues if we're talking about the initial, um, altercation with correctional officers. We're talking about November 3rd. You can see that Judge Luck, understandably, he just wants to march through the multi-factor analysis. So, just bear with it. Sure. I think we can... Question one is... It's not an objectively serious need that required some medical attention. All right. And so, then we get to the second prong. Um, did Dr. Espino know at that point all of the things that I just ticked off? He knew about the original incident. He knew about the complaints of pain. He knew, uh, that medical professionals had seen him. He actually knew about the expert, uh, diagnosis and the recommendation by November 3rd, right? Your Honor mentioned brokenness. Dr. Espino didn't know about any broken fingers. There were a number of x-rays which indicated... Correct? Perhaps Burton thought that, but Burton received a number of x-rays. At least by November 3rd, there had been three rounds of x-rays which found no fracture, no dislocation. The most recent, at that time, October 2020... You agree with everything else that ticked off that Dr. Espino knew all of those things? He certainly knew that the finger had been assessed, that he had received multiple rounds of x-rays, and he was monitoring that treatment. That there was, uh, subjective, uh, indications of pain, that he had been seen multiple times by doctors and had been referred to an expert, and then an expert, uh, diagnosed the deformity and had recommended specific physical therapy. All true, correct? Dr. Espino knew that a, uh, an orthopedist... Did he know everything I just said? That's a yes or no. I mean, it just is. I believe so, Your Honor. Yes. I mean, I've looked at the medical records. You can see his stamp and his signature on each of those. Sure, Your Honor. Okay. All right. Now, the question is, is doing nothing in relation to that, does that put him in a subjective, uh, a serious risk of harm of super-added pain or additional pain or even potential further deformities by doing nothing? Well, with regard, no, Your Honor. And with regard to pain, we know that, uh, Burton had access, uh, to pain medication as needed. That's reflected in the medical records. He had... Right, but it wasn't working. He was saying, I'm still in pain, despite my access to all these medications. So at that point, the decision of, of whether to provide more medication, uh, the decision of whether or not, uh, to order a physical, uh, therapy referral, I think that falls squarely, uh, within... I agree. But doing something would seem to have to be in that. In other words, you just said things that are something, and if we were here, we'd be talking about something different. But what the record shows is, he came in, he said, I'm still mad at you, get out of here, and, and denied his request for physical therapy. I wouldn't characterize it as doing, as doing nothing. I think the record supports the fact that, um, there was nothing to indicate that any change in the treatment that had been provided, um, was, was indicated, Your Honor. Can I ask one operational question to you as well? Um, am I correct in understanding that there is no qualified immunity defense in this case? None has been pleaded, argued before us, before the district court? As it's before us right now, I, I don't believe so, Your Honor. Okay. Very well. All right, Mr. Hart, you've got three minutes remaining. Thank you, Your Honor. Um, uh, we did just do a quick check, Judge Lutkis, to your question in the Middle District of Florida local rules. It doesn't appear that there's a requirement to submit something else like that, although perhaps that would be helpful. Um, I do want to, Judge Leibowitz, as to your comment about, um, retaliation maybe being, you know, having some heartburn about that one. I, I didn't mention this in the opening, but of course, at summary judgment, uh, the statements, uh, the reasons for the denial of care, um, uh, as to the April 23rd interaction, um, not only was the district court obviously required to accept Burton's version of events, but there is no evidence in the record rebutting that Espino made those statements. Yeah, but let's, let's, let's do it together on, again, First Amendment retaliation. Let me concede. I think I was less than precise. I, I, I, and you can disabuse me if these statements are wrong. Um, I see no evidence in the record that Burton ever grieved a First Amendment retaliation claim, First Amendment retaliation claim with respect to the November 3rd, 2020, denial of PT. You agree with that? I believe that's the case, and maybe this, maybe, maybe I'm picking it up. Is this an exhaustion of administrative remedies, Your Honor? Well, it's, it's, it's partly that. What I, what I think is important, and, and I speak only for myself, is that I'm, I'm parsing the First Amendment retaliation claim, um, for all the reasons, uh, stated, um, uh, by Judge Luck and Newsom, because I think the medical indifference claim, you stand on very different ground, um, uh, in those claims. So that, that, that's the first one. Um, I do not see anything in the record that your client ever grieved a First Amendment retaliation claim with respect to the November 3rd, 2020, denial of PT. Do you agree with that? Yeah. I don't believe he's got a grievance regarding that specific. Okay. Next. Um, my review of all the grievances filed in this record, in this summary judgment record where you only need a genuine issue of material fact to be raised, light most favorable to you, my review of the grievances reveals that none of them addresses Dr. Espino's refusal to care for Burton because he filed grievances. Do you agree with that? I don't believe, I'd, I'd have to double check. I don't believe any of them specifically mentioned grievances, but just the general notion that, you know, what happened was not right. So let's turn now, because I think you're, you're, you're too kind to say it. Your response to me is, is yeah. But he said on November 3rd, um, Espino says, quote, I told you about writing those grievances on me. Get out of my office. That's in the record. Um, but there is no evidence in the record that Burton ever then grieved his First Amendment retaliation claim. In fact, the only thing that I can find that postdates November 3rd, when that statement is made, and it is in your complaint, is that on January 6th, he complains, January 6th, 2021, he complains only about being denied adequate medical care. He does not say anything about, and I was retaliated against for what, and I have November 3rd for you. You agree with that, right? I do. I, I guess this really does seem like an exhaustion of administrative remedies concern. It does. It was conceded by Dr. Espino in his answer that Burton had exhausted his administrative remedies. I understand. I understand that. It was conceded on appeal as well. I, I, I get, I get that, that that's conceded, but I just want to make sure that I understand the record, because it certainly goes to causation, does it not? You have to prove a genuine issue, there has to be raised a genuine issue of material fact that the first amendment conduct caused, caused what the doctor did. Now I, I think what your answer to that is, is I got the one statement. I got the statement, get it, get out of my office. I just want to make sure, is there anything else beyond that as to causation? The statements are really carrying the day there. That's it. Thank you, counsel. I appreciate the clarification. Okay, very well. And thank you again for your service to your client and the court. Very well argued on both sides. The case is submitted and the court will be in recess until tomorrow morning at 9 a.m.